**CLOSED**

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MARIA M. DIAZ, | : | |
| Plaintiff, | : | Civil Action No. 07-790 (SRC) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**<u>CHESLER</u>**, District Judge

### <u>INTRODUCTION</u>

This matter comes before the Court on the appeal by Plaintiff Maria M. Diaz ("Plaintiff"),

of the final decision of the Commissioner of Social Security ("Commissioner") determining that

she is not eligible for Social Security Disability Insurance Benefits ("DIB") or Supplemental

Security Income Benefits ("SSI") under the Social Security Act ("the Act") prior to July 1, 2005.

This Court exercises jurisdiction pursuant to 42 U.S.C. § 405(g) and, having considered the

submissions of the parties without oral argument, pursuant to L. CIV. R. 9.1(b), finds that the

Commissioner's decision is supported by substantial evidence and is hereby **AFFIRMED**.

### <u>PROCEDURAL HISTORY</u>

Plaintiff alleges disability beginning December 31, 2000.  (R. at 122-27.)  She filed a

Title II application for a period of disability and DIB on June 6, 2002, and again on July 23,

2003, and filed a Title XVI application for SSI on May 30, 2003.  (<u>Id.</u>)  The claims were

dismissed initially on April 7, 2004, and again upon reconsideration on August 23, 2004.  (R. at

73-76, 84-87.)  A request for hearing was filed on December 8, 2004, which was dismissed on

March 11, 2005.  (R. at 72.)  On June 17, 2005, the Appeals Council vacated the dismissal and

remanded the case for further proceedings.  (R. at 97-99.)  A hearing was held on October 25,

2005, before Administrative Law Judge Joel H. Friedman ("ALJ Friedman" or "ALJ").  (R. at

24-64.)  ALJ Friedman issued a decision on July 28, 2006, finding that Plaintiff was not disabled

prior to July 1, 2005, but became disabled on that date and continues to be disabled.  (R. at 12-

23.)  The ALJ found:

1.  The claimant last met the insured status requirements of the Social
    Security Act on December 21, 2005.

2.  The claimant has not engaged in substantial gainful activity at any time
    relevant to this decision (20 CFR 404.1520(b), 404.1571 *et seq*.,
    416.920(b) and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: diabetes,
    hypertension, asthma, back disorder, degenerative joint disease of the
    knee, adjustment disorder and obesity (20 CFR 404.1520(c) and
    416.920(c)).

4.  The claimant does not have an impairment or combination of impairments
    that meets or medically equals one of the listed impairments in 20 CFR
    Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).[1]

5.  The claimant has the residual functional capacity to perform simple,
    routine sedentary work that does not require concentrated exposure to
    pulmonary irritants and never requires crawling or the climbing of ropes or
    ladders.

6.  The claimant is unable to perform any past relevant work (20 CFR
    404.1565 and 416.965).

7.  The claimant was 40 years old on the alleged onset date of disability.  This
    is defined in the regulations as a younger individual [age] 18-44.  On July
    1, 2005, the claimant attained 45 years of age and her age category
    changed to closely approaching advanced age (20 CFR 404.1563 and
    416.963).

8.  The claimant has a limited education and is not able to communicate in

_____

[1] Hereinafter, "Listing" refers to the list of severe impairments as found in 20 C.F.R.
Subpart 404, Part P, Appendix 1.

2

English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant has an unskilled background (20 CFR 404.1568 and 416.968).

10. Prior to July 1, 2005, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

11. Beginning on July 1, 2005, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

12. The claimant was not disabled prior to July 1, 2005, but became disabled on that date and has continued to be disabled (20 CFR 404.1520(g) and 416.920(g)).

13. The claimant was under a disability within the meaning of the Social Security Act prior to her date last insured of December 31, 2005 (20 CFR 404.315(a) and 404.320(b)).

(R. at 17-23.)  Based on these findings, ALJ Friedman concluded that Plaintiff qualified for a period of disability and DIB under sections 216(i) and 223(d), respectively, of the Act starting on July 1, 2005.  (R. at 23.)  ALJ Friedman also concluded that Plaintiff qualified for SSI under section 1614(a)(3)(A) of the Act beginning July, 1 2005.  (Id.)  On September 29, 2006, Plaintiff filed an appeal with the Appeals Council (R. at 11) and on December 12, 2006, the Appeals Council denied the request for review.  (R. at 5-7.)  On October 10, 2007, Plaintiff filed the instant action, seeking review of the determination by the Commissioner denying her application for DIB and SSI for the time period prior to July 1, 2005.  (Pl.'s Br. 1-35.)

## STATEMENT OF THE FACTS

### A.   Background

Plaintiff was last employed in 2000.  (R. at 31.)  She was born on July 1, 1960, in the Dominican Republic where she completed school up to the eighth grade, and came to the United

3

States in 1982.  (R. at 29-31.)  She is unable to read or write in English and testified at her

October 25, 2005, hearing before ALJ Friedman in Spanish with the use of a translator.  (R. at

26-42.)  Plaintiff stated that she is five feet tall and weighs 247 pounds.  (R. at 30-31.)  Plaintiff

reports that she most recently worked from 1997-2000 as a babysitter, where her duties consisted

of sending the children to school, picking them up, feeding them, and generally helping with their

needs.  (R. at 156-57.)  She stated that this job required her to walk for two hours a day, stoop for

two hours, sit for three hours, and stand, climb, kneel, and crouch for approximately one hour

each per day.  (Id.)  Plaintiff never had to lift ten pounds or more.  (Id.)  Prior to this job, she

worked as a packager in a food processing plant, a position that demanded "high speed standing"

for four hours a day and frequent lifting of items weighing ten pounds, with the heaviest item

exceeding 100 pounds.  (R. at 134, 158.)  Plaintiff testified that none of her former occupations

were "sitting down jobs."  (R. at 34.)

**B.**   **Claimed Disabilities**

Plaintiff claims that she stopped working as a babysitter on December 31, 2000, because

she "could not keep bending down and assisting the children's needs."  (R. at 133 (Disability

Report Application).)  Plaintiff states that the conditions limiting her ability to work are

"scoliosis, diabetes, cholesterol, asthma, high arterial blood pressure, and arthritis."  (Id.)  She

explains that these impairments prevented her from being able to stand for a long period of time,

and lead to headaches, asthma attacks, and chest pains.  (Id.)  As of June 6, 2002, Plaintiff's

primary physician, Dr. Patel, prescribed her Singular, Serevent, and Flovent to treat her asthma,

Metformin, Glucontrol, Avandia, and Amaryl to treat her diabetes, Enalapril and Cartia to treat

her arterial blood pressure and Zocor to treat her high cholesterol.  (R. at 138-40.)  Plaintiff also

testified that she takes Tylenol and Advil for her pain, which provide temporary relief.  (R. at 32-38.)

At her hearing, Plaintiff speculated that she could work for up to three minutes at a job that requires her to stand before her back would start to hurt.  (R. at 36.)  She testified that she can walk about a half a block before her back and legs start to hurt.  (Id.)  The pain affects both legs, but primarily moves from her hip down to her left knee.  (Id.)  Plaintiff further stated that she has swelling in her knees and ankles.  (R. at 40.)  Finally, Plaintiff testified that she can sit for "about half an hour" and that she needs to take "shifts between sitting and standing."  (R. at 36.)

**C.**    **Medical Evidence Considered by the ALJ**

The record indicates that Plaintiff has been evaluated by treating and consultative physicians between the dates of April 16, 1999, and December 2, 2004.  (R. at 226-435.)

1.    Treating Physician Dr. Diptika Patel's Examinations

Dr. Diptika Patel treated Plaintiff approximately forty-eight times at regular intervals between April 16, 1999, and December 3, 2004.  (R. at 294-372, 416-35.)  Plaintiff visited Dr. Patel on April 18, 2000, and she was diagnosed with "morbid obesity."  (R. at 318.)  On March 12, 2001, Plaintiff saw Dr. Patel with complaints of back pain that she had temporarily relieved with Tylenol.  (R. at 312.)  On May 13, 2002, Dr. Patel noted that Plaintiff had stiffness and decreased motion in her lumbosacral spine.  (R. at 308.)  A chest x-ray on May 17, 2001, revealed "no gross, acute pulmonary disease," (R. at 349) and a November 19, 2002, echocardiogram was an "essentially normal study," (R. at 333).

2.    Raritan Bay Medical Center's Examination

5

Plaintiff was hospitalized on May 24, 2000, for chest pain.  (R. at 223-62.)  She was diagnosed by Dr. Dewan Khan with "non-insulin dependent-diabetes mellitus[,] hypertension[,] morbid obesity [and] hyperlipidemia."  (R. at 247.)  Her chest x-ray and EKG were normal.  (R. at 255-56.)  Cardiac catheterization revealed normal coronary arteries and "normal left ventricular global systolic function, ejection fraction of 70%."  (R. at 259.)

3.      <u>Dr. Francky Merlin's Examination</u>

The Division of Disability Determination Service's consultative examiner Dr. Francky Merlin saw Plaintiff on October 23, 2002.  (R. at 263-73.)  Plaintiff presented with complaints of high blood pressure, arthritis and asthma.  (R. at 263.)  A physical examination revealed that Plaintiff was 4 feet, 11½ inches tall and weighed 252 pounds.  (R. at 264.)  She moved normally, her lumbosacral spine had a full, painless range of motion with negative straight leg raising, and her grasping strength and manipulative functions were not impaired.  (R. at 265.)  Plaintiff also had a +1 edema bilaterally.  (<u>Id.</u>)  Dr. Merlin diagnosed Plaintiff with uncontrolled hypertension, diabetes mellitus, asthma, and obesity and noted that Plaintiff had a history of arthritis but it was stable.  (<u>Id.</u>)  Dr. Merlin concluded that Plaintiff was "able to sit, stand, walk, handle objects, hear, speak [and] travel," but that "[s]he should not be exposed to dust, fumes or extremes in temperature."  (R. at 266.)

4.      <u>Dr. Joseph Micale's Physical Residual Functional Capacity Assessment</u>

Dr. Joseph Micale[2] conducted a physical residual functional capacity assessment of Plaintiff on January 16, 2003.  (R. at 275-82.)  Dr. Micale determined that Plaintiff's exertional

---

[2]Although ALJ Friedman did not cite Dr. Micale by name, consideration of the doctor's opinion is implicit in the ALJ's steps four and five analysis due to the language used by ALJ Friedman mirroring Dr. Micale's report.  (R. at 19.)

limitations allowed her to frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight hour workday, and sit for a total of about six hours in an eight hour workday. (R. at 276.)  Dr. Micale determined that Plaintiff's obesity, among other impairments, created the postural limitations that enabled her to crawl on occasion, but never climb ladders, ropes or scaffolding.  (R. at 277.)  Dr. Micale found that Plaintiff's asthma caused the following environmental limitations:  she should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards.  (R. at 279.)  In sum, Dr. Micale diagnosed Plaintiff with "medically determinable impairments of morbid obesity, asthma with mild COPD [and] low back syndrome."  (R. at 280.)  Dr. Micale stated that the impairments are "consistent with the total medical and no[n-]medical evidence.  [Plaintiff's] morbid obesity [and] low back syndrome should allow her to perform light work . . . [but] [s]he should avoid fumes, etc."  (Id.)  Dr. Micale also indicated that his conclusions about Plaintiff's limitations were similar to the conclusions reached by Dr. Merlin.  (R. at 281.)

5.    Dr. Fahreet Noor's Examination

Dr. Fahreet Noor, a physician with the Division of Disability Determination Services, examined Plaintiff on October 10, 2003.  (R. at 290-93.)  Dr. Noor's examination included medical history, systems review, a physical examination and laboratory findings.  (Id.)  Dr. Noor found that Plaintiff's "range of motion [was] moderately severely restricted on both knees and hips," likely due to Plaintiff's "habitus," and that Plaintiff had "moderate, severe arthritic changes particularly on both knees."  (R. at 292.)  Dr. Noor observed "[m]arked crepitus bilaterally on both knees and ankles."  (Id.)  The doctor also noted that Plaintiff had 20/25 vision in both eyes, a regular heart rate and rhythm, and no edema in the extremities.  (Id.)  Dr. Noor's

7

clinical impressions were that Plaintiff had "moderately severe osteoarthritis, particularly of the

lower extremity[,] essebtuak hyptertension-controlled[,] diabetes mellitus[,] morbid obesity [and]

hyptecholesterolemia."  (R. at 293.)

      6.     Dr. F. Miranda's Physical Residual Functional Capacity Assessment

Dr. F. Miranda conducted a physical residual functional capacity assessment of Plaintiff

on January 15, 2004.[3]  (R. at 391-98.)  Dr. Miranda determined that Plaintiff's exertional

limitations allowed her to frequently lift and/or carry ten pounds, stand and/or walk for about

four hours in an eight hour workday, and sit for less than six hours in an eight hour workday.  (R.

at 392.)  Dr. Miranda found that Plaintiff's postural limitations prohibited her from crawling and

climbing ramps, stairs, ladders, ropes, or scaffolding, (R. at 393) but that Plaintiff had no

environmental limitations (R. at 395).  In attributing medical sources to Plaintiff's symptoms, Dr.

Miranda determined that Plaintiff's "pain in multiple joints and back is due to multiple arthritis

[], diabetes, [], and obesity."  (R. at 396.)  Dr. Miranda stated that the severity of Plaintiff's pain

in her back and joints is supported by "findings in the x-ray and clinical evidence in the record."

(Id.)

      7.     Dr. Rashel Potashnik's Examination

Dr. Rashel Potashnik conducted an orthopedic evaluation of Plaintiff for the Division of

Disability Determination Services on March 1, 2004.  (R. at 373-79.)  Dr. Potashnik observed

that Plaintiff had a "normal gait pattern" but was limited to a half-squat due to pain in her left

knee.  (R. at 374.)  Plaintiff's lumbosacral spine had no tenderness and the range of motion was

---

[3] Dr. Miranda's assessment of January 15, 2004, was updated on March 11, 2004, and then reviewed and affirmed on April 7, 2004.  (R. at 398.)

normal.  (Id.)  Plaintiff had a full range of motion in her left knee with no crepitus, but had

"tender[ness] on palpation of patellofamoral joints, medial and later joint line and pes anaerinus."

(R. at 375.)  A lumbosacral spine x-ray revealed, among other things, "[a]rthric changes with

small spurring formation over its anterior corners of L4 and L1."  (R. at 379.)  Dr. Potashnik's

impression was that "[e]xamination findings are supportive of left knee arthritis with preserved

range of motion," and "[l]umbar spine examination was unremarkable except for findings

suggestive of left sacroiliac syndrome."  (R. at 375.)

    8.    Dr. Alvaro Gutierrez's Psychiatric Evaluation

    Division of Disability Determination Services consultative examiner Dr. Alvaro Gutierrez

saw Plaintiff on March 1, 2004.  (R. at 380-82.)  Plaintiff had several somatic complaints and

presented with an anxious and depressed mood.  (R. at 381.)  She followed instructions, followed

the topic of conversation, repeated a seven-digit number, did simple math problems but not serial

sevens, and "was oriented to time, place and person."  (R. at 381-82.)  Dr. Gutierrez noted that

Plaintiff was overweight, and diagnosed her with "[a]djustment disorder with depressed and

anxious mood," on Axis I, nothing on Axis II, and "[d]iabetes mellitus[,] [a]sthma[,]

[h]ypertension[,] [s]coliosis and arthritis," on Axis III.  (R. at 382.)

    9.    Dr. David Tiersten's Examination

    The Division of Disability Determination Services referred Plaintiff to Dr. David Tiersten

for a consultative orthopedic examination and he examined her on  July 1, 2004.  (R. at 384-86.)

Dr. Tiersten noted that Plaintiff "has a wide-based gait.  Squat is 30% full."  (R. at 385.)  Her

range of motion was full in the hips, knees and ankles with no joint effusion, inflamation or

instability.  (Id.)  Dr. Tiersten diagnosed Plaintiff with "severe obesity[,] [n]on-insulin dependent

diabetes mellitus[,] [h]ypertension[,] [b]ack and chest pain[,] [h]ypercholesterolemia [and] [b]ronchial asthma." (R. at 386.) Dr. Tiersten further reported that "[d]espite the complaint of back pain, claimant has a full range of motion of the lumbosacral spine, tenderness, but not spasm in the lumbosacral region paraspinally and [straight leg raising] is negative bilaterally." (Id.)

      10.    <u>Medical Consultant's Mental Residual Functional Capacity Assessment</u>

The state agency medical consultant ("consultant") conducted a mental residual functional capacity ("MRFC") assessment of Plaintiff on March 12, 2004. (R. at 387-90.) Section I, the "Summary Conclusions" section of the MRFC form, requires the consultant to evaluate the mental capacity of the Plaintiff based on the evidence in the record. (R. at 387-88.) In that section, the consultant found that Plaintiff was "moderately limited" in the following capacities: "the ability to understand and remember detailed instructions"; "the ability to maintain attention and concentration for extended periods"; "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "the ability to sustain an ordinary routine without special supervision"; "the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "the ability to accept instructions and respond appropriately to criticism from supervisors"; "the ability to respond appropriately to changes in the work setting"; and "the ability to travel in unfamiliar places or use public transportation." (Id.) The consultant also found Plaintiff to be "markedly limited" in her "ability to carry out detailed instructions," but "not significantly limited" in the remaining eleven categories of evaluation. (Id.)

The consultant then explains in narrative form how the Section I determinations effect Plaintiff's limitations or functional abilities, in Section III, the "Functional Capacity Assessment" section of the MRFC form.  (R. at 389.)  In that section, the consultant concluded that Plaintiff's "psych[iatric] condition does not impair her ability to follow simple instructions, attend and concentrate, keep adequate pace and persist, [or] relate and adapt to routine tasks and work situation[s]."  (Id.)

On the Psychiatric Review Technique Form, also dated March 12, 2004, the consultant found that Plaintiff had "difficulty concentrating or thinking," and diagnosed her with "[an] adjustment disorder with depressed and anxious mood."  (R. at 399.)  The consultant also found that Plaintiff had moderate difficulties in "maintaining concentration, persistence or pace."  (R. at 407.)

11.   <u>Medical Expert Dr. Martin Fechner's Testimony on Review of the Medical Records</u>

Medical expert Dr. Martin Fechner testified before the ALJ on October 25, 2005.  (R. at 42.)  Dr. Fechner concluded that Plaintiff has exogenous obesity, high blood pressure, asthma, and back and knee pain.  (R. at 43-44.)  He testified that her conditions did not meet or equal any of the medical listings, either alone or in combination.  (R. at 44.)  Dr. Fechner was wary of Dr. Noor's diagnosis of severe/moderate to severe arthritic changes and marked crepitus, because Dr. Noor did not use an x-ray in coming to her conclusion and "crepitus is a very subjective symptom, sign as far as the doctor is concerned [and] one would really need to have an x-ray to have a better idea."  (R. at 44-46.)  However, Dr. Fechner did state that such a condition, if found, would limit Plaintiff to only sedentary activities in the workplace.  (R. at 44-45.)  Dr.

Fechner found that Plaintiff "could lift ten pounds occasionally," "sit [for an] aggregate of six hours in an eight-hour day with some standing and walking in between" and "stand or walk for an aggregate of two hours in an eight-hour day."  (R. at 46.)  He also testified that Plaintiff's asthma restricts her from being exposed to extreme temperatures or chemicals that may irritate her lungs, though she would not require a clean room to work in or any other "excessive" prevention methods.  (R. at 45.)

**D.      Vocational Evidence Considered by the ALJ**

Rocco Meola, a vocational rehabilitations counselor, testified before the ALJ on October 25, 2005, as a vocational expert.  (R. at 50.)  Mr. Meola testified that he reviewed Plaintiff's previous work experience and found that she does not have any transferable skills.  (R. at 51.)  The ALJ then posited a hypothetical to Mr. Meola for his vocational assessment.  (R. at 52.)  ALJ Friedman asked Mr. Meola to consider Plaintiff, before the age of forty-five, with her limited education and inability to speak English, and

> assume . . . that I found her capable of performing exertional demands of sedentary work as defined in the Regulations.  If you were to add to that hypothetical, the non-exertional limitation that the person would be limited to simple, routine, work tasks.  That she would . . . be markedly limited[,] not able to carry out detailed instructions.  If she also had the environmental restrictions pointed out by the medical expert, she would need to avoid concentrated exposures to temperature extremes and fumes, odor, dusts, [and] gases.  And that she could never climb ropes and ladders or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel or crouch . . . and never crawl.

(Id.)  Mr. Meola determined that such an individual, even if he or she needed to stand up to stretch every forty-five minutes, could still perform occupations such as "small parts assembler, parts sorter, parts inspector, [] inspector, weight tester," and that approximately 1,500 jobs of this type existed in the region and over 40,000 in the national economy.  (R. at 53-54.)  Mr. Meola

testified that, if due to depression or pain, a person had difficulty "maintaining attention and concentration on simple tasks," that person would not be able to perform any jobs.  (R. at 54.)

Mr. Meola then answered questions on cross-examination by Plaintiff's attorney.  (R. at 54-60.)  Plaintiff's attorney presented Mr. Meola with the MRFC form filled out by the state agency medical consultant, and looked at the categories in which the consultant found Plaintiff to have moderate limitations.  (R. at 56-58.)  Mr. Meola stated that "if the person is not able to maintain attention/concentration for extended periods of time at a moderate level, that would, in my opinion, impair them from working in a competitive labor market."  (R. at 57.)  Mr. Meola also added that a person would be impaired in completing the jobs he had cited if the person could not "maintain regular attendance," "work without special supervision," or "[complete] a normal work week and work day without interruption from psychologically based symptoms."  (R. at 57-58.)

## DISCUSSION

### A.    Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Servs., 841 F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla, but need not rise to the level of a preponderance."  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d

Cir. 2004).  The reviewing court must consider the totality of the evidence and then determine

whether there is substantial evidence to support the Commissioner's decision.  See Taybron v.

Harris, 667 F.2d 412, 413 (3d Cir. 1981).

　　　　The reviewing court is not "empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir.

1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993).  If the ALJ's findings of

fact are supported by substantial evidence, this Court is bound by those findings, "even if [it]

would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d

Cir. 2001); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

　　　　In determining whether there is substantial evidence to support the Commissioner's

decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses

and expert opinions of treating and examining physicians on subsidiary questions of fact; (3)

subjective evidence of pain testified to by the claimant and corroborated by family and neighbors;

(4) the claimant's educational background, work history and present age."  Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1973).  "The presence of evidence in the record that

supports a contrary conclusion does not undermine the Commissioner's decision so long as the

record provides substantial support for that decision."  Sassone v. Comm'r of Soc. Sec., 165 F.

App'x 954, 955 (3d Cir. 2006) (citing Blalock, 483 F.2d at 775).

**B.**　　**Standard for Awarding Benefits Under the Act**

　　　　The plaintiff bears the initial burden of establishing her disability.  42 U.S.C. §

423(d)(5).  To qualify for SSI benefits, the plaintiff must first establish that she is aged, blind, or

"disabled[,]" 42 U.S.C. § 1381a, see 42 U.S.C. § 1382c, and DIB benefits require a showing "of

14

disability[,]" 42 U.S.C. § 423.  The plaintiff is deemed "disabled" under the Act if she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether the plaintiff's impairment is so severe that she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  To demonstrate that a disability exists, the plaintiff must present evidence that her affliction "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.**     **The Five-Step Evaluation Process**

Determinations of disability are made by the Commissioner pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  The plaintiff bears the burden of proof at steps one through four.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

At the first step of the evaluation process, the Commissioner must determine whether the plaintiff is currently engaged in substantial gainful activity.[4]  20 C.F.R. §§ 404.1520(a)(4)(i), (b). If the plaintiff is found to be engaged in such activity, she is not "disabled" and the disability claim will be denied.  Id.; Yuckert, 482 U.S. at 141.

---

[4] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

At step two, the Commissioner must determine whether the plaintiff is suffering from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). An impairment is severe if it "significantly limits [a plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. 404.1520(c). In determining whether the plaintiff has a severe impairment, the age, education, and work experience of the plaintiff will not be considered. Id. If the plaintiff is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the plaintiff's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). If a plaintiff's impairment meets or equals one of the listed impairments, she will be found disabled under the Act. If a plaintiff does not suffer from a listed impairment or its equivalent, the analysis proceeds to step four.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings apply and give reasons why those listings are not met or equaled. In Jones v. Barnhart, 364 F.3d 501 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id. at 505. An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant Listing." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the plaintiff retains the residual functional

capacity to perform her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e).  If the plaintiff

is able to perform her past relevant work, she will not be found disabled under the Act.  20

C.F.R. § 404.1520(a)(4)(iv).  In Burnett, the Third Circuit set forth the analysis required at step

four:

> In step four, the ALJ must determine whether a claimant's residual functional
> capacity enables her to perform her past relevant work. This step involves three
> substeps: (1) the ALJ must make specific findings of fact as to the claimant's
> residual functional capacity; (2) the ALJ must make findings of the physical and
> mental demands of the claimant's past relevant work; and (3) the ALJ must
> compare the residual functional capacity to the past relevant work to determine
> whether claimant has the level of capability needed to perform the past relevant
> work.

Burnett, 220 F.3d at 120.  If the plaintiff is unable to resume her past work and her condition is

deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must

demonstrate that there are other jobs existing in significant numbers in the national economy that

the plaintiff can perform, consistent with her medical impairments, age, education, past work

experience, and residual functional capacity.  20 C.F.R. §§ 404.1512(g), 404.1520(a)(4)(v),

404.1560(c)(1).  If the ALJ finds a significant number of jobs that the plaintiff can perform, the

plaintiff will not be found disabled.  20 C.F.R. § 404.1520(a)(4)(v).  Additionally, pursuant to 42

U.S.C. § 423(d)(2)(B), in the fifth step, the Commissioner "must analyze the cumulative effect of

the plaintiff's impairments in determining whether she is capable of performing work and is not

disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).

When the plaintiff has only exertional limitations, the Commissioner may utilize the

Medical-Vocational Guidelines found in 20 C.F.R. Part 404, subpart P, Appendix 2 to meet the

burden of establishing the existence of jobs in the national economy.  These guidelines dictate a

result of "disabled" or "not disabled" according to combinations of factors including age, education level, work history, and residual functional capacity.  The guidelines also reflect the administrative notice taken of the numbers of jobs in the national economy that exist for different combinations of these factors.  20 C.F.R. § 404(P), app. 2, para. 200.00(b).  When a plaintiff's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guidelines direct a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983).  The plaintiff may rebut any finding of fact as to a vocational factor.  20 C.F.R. § 404(P), app. 2, para. 200.00(a).  If the plaintiff's impairments include  "non-exertional" restrictions, the guidelines will not accurately reflect the plaintiff's vocational realities and thus a vocational expert may be used to consider the combined effects of the plaintiff's exertional and non-exertional limitations.  20 C.F.R. § 404.1566(e); Burnam v. Schweiker, 682 F.2d 456, 458 (3d Cir. 1983); see also, Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983.)

Additionally, throughout the disability determination process, the Commissioner must "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to qualify the plaintiff for benefits."  42 U.S.C. § 423(d)(2)(B).  However, the burden still remains on the plaintiff to prove that the impairments in combination are severe enough to qualify her for benefits.  See Williams v. Barnhart, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability).

Finally, while Burnett involved a decision in which the ALJ's explanation of the step three determination was so inadequate as to be beyond meaningful judicial review, the Third

18

Circuit applies its procedural requirements, as well as its interpretation in Jones v. Barnhart, 364 F.3d 501, to every step of the decision.  See, e.g., Rivera v. Commissioner, 164 F. App'x 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

## D.      ALJ Friedman's Findings

_____ALJ Friedman applied the five-step sequential evaluation process and determined that, prior to July 1, 2005, Plaintiff was not disabled, but on that date she became eligible for DIB under sections 216(I) and 223(d), and SSI under section 1614(a)(3)(A) of the Act.  (R. at 23.)  ALJ Friedman determined that on that date, "[Plaintiff's] age category changed; considering [her] age, education, work experience and residual functional capacity," and therefore "a finding of 'disabled' is reached by direct application of Medical-Vocational Rule 201.17."  (R. at 22.)  The ALJ found that Plaintiff continued to be disabled from July 1, 2005, through the July 28, 2006 decision.  (Id.)  Finally, ALJ Friedman determined that Plaintiff "was under a disability within the meaning of the Social Security Act  prior to her date last insured of December 31, 2005 (20 CFR 404.315(a) and 404.320(b))."  (R. at 23.)

At step one, ALJ Friedman found that Plaintiff "has not engaged in substantial gainful activity at any time relevant to [the ALJ's] decision" and has not worked since 2000.  (R. at 17.)

At step two of the evaluation, ALJ Friedman determined that Plaintiff "has the following severe impairments:  diabetes, hypertension, asthma, back disorder, degenerative joint disease of the knee, adjustment disorder and obesity."  (Id.)  In coming to this conclusion, the ALJ extensively discussed his finding that Plaintiff's adjustment disorder constituted a severe impairment.  (R. at 18.)  The ALJ noted that Plaintiff has no history of seeking psychiatric

treatment, takes no psychiatric medicine, and that the "only evidence in this regard is the report

of consultative examiner Dr. Gutierrez . . . [whose diagnosis] was that she had an adjustment

disorder with a depressed and anxious mood." (Id.) ALJ Friedman also gave significant

consideration to the state agency medical consultant's report as an expert opinion pursuant to

SSR 96-6p.,[5] which stated that Plaintiff has a severe impairment in that she has a moderate

difficulty in maintaining concentration, persistence or pace. (R. at 18.) However, the ALJ noted

that the consultant's conclusion was unsupported by objective medical evidence. (R. at 18.)

Thus, ALJ Friedman explained that he gave Plaintiff "every benefit of the doubt" in finding that

her adjustment disorder constituted a severe impairment. (Id.)

At step three, ALJ Friedman found that Plaintiff lacked any "impairment or combination

of impairments that meets or medically equals, one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d))." (Id.) ALJ Friedman determined:

1. Listing 9.08, pertaining to diabetes mellitus, is not met because there is no evidence of neuropathy, acidosis or of a visual impairment.
2. Listing 4.03, pertaining to hypertensive cardiovascular disease, is not met because there is no evidence of chronic heart failure or of vision, renal or neurological damage.
3. Listings 3.02 and 3.03, pertaining to chronic pulmonary insufficiency and asthma respectively, are not met because pulmonary function testing did not have the required values and [Plaintiff] has not had chronic asthmatic bronchitis or attacks at the required frequency.
4. Listing 1.04, pertaining to disorders of the spine, is not met because there is no evidence of motor, reflex or sensory loss or of positive straight leg raising.
5. Listing 1.02A, pertaining to major dysfunction of a joint, is not met because there is no evidence of an inability to ambulate effectively.

---

[5] SSR 96-6p instructs judges that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review." SSR 96-6p, 61 Fed. Reg. 34,466 (July 2, 1996).

     6.      Listing 12.04 is not met because the [plaintiff] has no more than mild restrictions of her activities of daily living, only mild limitations in her social functioning, no more than moderate limitations with respect to her ability to maintain concentration[,] persistence and pace and no evidence of any periods of decompensation.  Nor are any of the "C" criteria satisfied.

(R. at 18-19 (numbering added).)  ALJ Friedman also noted that Dr. Fechner testified at the

hearing that Plaintiff "did not meet or equal any listing."  (R. at 19.)

After finding that none of Plaintiff's disabilities met or equaled the listed impairments,

ALJ Friedman next determined Plaintiff's residual functional capacity.  (Id.)  The ALJ found that

Plaintiff "has the residual functional capacity to perform simple, routine sedentary work that does

not require concentrated exposure to pulmonary irritants and never requires crawling or the

climbing of ropes or ladders."  (Id.)  In reaching this conclusion, the ALJ considered Plaintiff's

testimony that she was unable to work due to problems with her legs, back, and spine and that

these problems made her unable to sit and stand for long periods of time.  (Id.)  However, while

ALJ Friedman found these symptoms could be expected based on Plaintiff's medical records, he

determined that the evidence within the record showed that the "intensity, duration and limiting

effects of these symptoms are not entirely credible."  (Id.)  The ALJ reviewed Plaintiff's

examination and treatment records from Doctors Merlin, Noor, Potashnick, Tiersten, and

Fechner.  (R. at 19 (Dr. Merlin's finding that "[Plaintiff's] lumbosacral spine had a full, painless

range of motion with negative straight leg raising"); R. at 20 ("Dr. Noor described marked

crepitus in [Plaintiff's] knees and ankles and moderately restricted range of motion in her knees

and hips but suspsected that her body habitus played a part"); id. (Dr. Potashnick "observed

[Plaintiff] to move about normally . . . except that she was limited to half a squat," and that

Plaintiff had "no tenderness in [her] lumbosacral spine, range of motion was normal and straight

21

leg raising was negative"); id. (Dr. Tiersten's finding that Plaintiff's "lumbosacral spine had paraspinal tenderness but no spasm and range of motion was full. Straight leg raising was negative"); id. (Dr. Fechner's testimony that "[Plaintiff] was limited to sedentary work with restrictions due to asthma . . . [that] go as far back as the middle of 2002").)  In making his determination, ALJ Friedman gave "[c]ontrolling weight" to the reports conducted by Doctors Merlin, Potashnik and Tiersten, who determined that Plaintiff "could move about in a normal manner except for squatting," had a full range of motion in her lumbosacral spine, did not have crepitus, and "straight leg raising was negative."  (R. at 20.)  ALJ Friedman further noted that these reports were consistent with Dr. Fechner's medical opinion.  (Id.)

At step four of the analysis, ALJ Friedman found that Plaintiff could not perform her past relevant work as a packer/assembler and babysitter since the exertional demands of those jobs exceeded her residual functional capacity.  (Id.)

Moving on to the final step of the analysis, ALJ Friedman relied on the testimony of a vocational expert and determined that a significant number of jobs existed in the national economy that Plaintiff could have performed prior to July 1, 2005.  (R. at 21.)  As a basis for his analysis, ALJ Friedman first noted that Plaintiff was forty years old when she claimed disability and thus qualified as a "younger individual [age] 18-44."  (R. at 20.)  However, he also acknowledged that, on July 1, 2005, Plaintiff reached age forty-five, "and her age category changed to closely approaching advanced age," as defined by 20 CFR 404.1564 and 416.964. (Id.)  ALJ Friedman noted Plaintiff's "limited education and [inability] to communicate in English."  (R. at 20.)  He also determined that "transferability of job skills is not an issue in this case because [Plaintiff] has an unskilled background."  (R. at 21.)  The ALJ then considered Plaintiff's "residual functional capacity, age, education and work experience in conjunction with

the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2."  (Id.)  However, the additional limitations that the ALJ included in Plaintiff's residual functional capacity exceeded the range of sedentary work in the Medical-Vocational Guidelines, so the ALJ considered the testimony of vocational expert Rocco Meola "[t]o determine the extent of erosion of the unskilled sedentary occupational base caused by these limitations."  (Id.)

ALJ Friedman posited a hypothetical to Mr. Meola for his vocational assessment of a person, prior to age forty-five, limited to sedentary, simple, and routine work tasks, that never involved crawling or climbing ropes, ladders, or scaffolds, with the additional environmental restrictions from concentrated exposure to "temperature extremes, fumes, odors, dusts [and] gases."  (R. at 52.)  Mr. Meola determined that such an individual, even if he or she needed to stand up to stretch every forty-five minutes, could still perform representative occupations such as a "small parts assembler, parts sorter, parts inspector, [] inspector [and] weight tester," and that approximately 1,500 jobs of this type existed in the region and over 40,000 in the national economy.  (R. at 53-54.)

Mr. Meola testified that, if due to depression or pain, a person had difficulty maintaining attention and concentration on simple tasks, then that person would not be able to perform any jobs.  (R. at 54.)  In disregarding this opinion, which was an answer to a question posed on cross-examination by Plaintiff's attorney, ALJ Friedman found that the basis for the attorney's hypothetical were the moderate limitations determined by the state agency medical consultant in Section I, "Summary Conclusions" of the MRFC form, and that these limitations were inconsistent with the medical evidence.  (R. at 21.)  The ALJ then concluded that these inconsistent limitations should not have been presented to Mr. Meola.  (Id.)  In explaining this determination,  ALJ Friedman first pointed out that the moderate limitations checked off by the

consultant in Section I need not be included in the hypothetical because the consultant's definition of "moderate" may be different from that of the vocational expert.  (R. at 22.)  Since the consultant concluded in Section III, "Functional Capacity Assessment", that Plaintiff's psychiatric condition "does not impair her ability to follow simple instructions, attend and concentrate, keep adequate pace and persist, [and] relate and adapt to routine tasks and work situations," the ALJ determined that this opinion supercedes any determination of moderate limitations found in Section I.  (Id.)  ALJ Friedman also emphasized that, "Section I is a summary conclusion derived from the evidence in the record, but the severity is what is set out in Section III."  (Id.)  Thus, the ALJ stated that the consultant is not giving a vocational assessment in Section III, determining that Plaintiff can work, but rather giving an assessment in narrative form of the degree and severity of Plaintiff's functional limitations.  (Id.)  Therefore, ALJ Friedman only considered the vocational expert's response to the hypothetical that was consistent with the consultant's conclusions in Section III.  (Id.)  Finally, the ALJ noted that Plaintiff's limitations were consistent with his hypothetical given to the vocational expert.  (Id.)

In reliance on the vocational expert's testimony, ALJ Friedman determined that Plaintiff was "not disabled" prior to July 1, 2005, since there were a significant number of jobs that Plaintiff could have performed in the national economy.  (Id.)

**E.**   **Analysis**

Plaintiff argues that ALJ Friedman's decision should be reversed because "substantial evidence in the administrative record establishes entitlement and eligibility" for DIB and SSI benefits for the time period after Plaintiff stopped working in 2000 through July 1, 2005.  (Pl.'s Br. 13.)  In the alternative, Plaintiff argues that the Commissioner's decision was not based on substantial evidence within the record and seeks a remand for a new hearing.  (Id.)  Plaintiff

24

states that:  1) after ALJ Friedman determined that Plaintiff suffered from obesity in step two of the analysis, he erred by not further analyzing her obesity impairment at steps three through five (id. at 22); 2) ALJ Friedman erred by assigning "controlling weight to the Commissioner's consultants in lieu of reliance on the treating physician" (id. at 25); and 3) ALJ Friedman's "hypothetical questioning of the vocational expert . . . was deficient"  (id. at 26).

**1.     Did the ALJ Properly Analyze Plaintiff's Obesity Impairment at Steps Three Through Five of the Five-Step Analysis as Required by the Commissioner?**

Plaintiff argues that, after determining her obesity constituted a severe impairment at step two, ALJ Friedman failed to analyze her obesity in accordance with SSR 00-3p[6] at steps three through five of the five-step analysis.  (Pl.'s Br. 22-25.)  The Commissioner asserts that the ALJ conducted a proper analysis.  (Def.'s. Br. 8.)

At step three of the evaluation, ALJ Friedman did not find Plaintiff's obesity to meet or equal one of the listed impairments, alone or in combination with her other impairments, despite finding that Plaintiff had the "severe impairment" of obesity at step two.  (R. at 17-19.)  ALJ Friedman relied on the testimony of medical expert Dr. Fechner in reaching this conclusion.  (R. at 19.)  Although Dr. Fechner classified Plaintiff as "exogenously obese," he stated that she did not meet or equal any of the listings, alone or in combination, based on his review of her entire medical records, wherein the majority of doctors diagnosed her with obesity.  (R. at 19.)  At step four, the ALJ relied on Plaintiff's medical records and determined that she had the residual functional capacity to "perform simple, routine sedentary work that . . . never requires crawling

---

[6] Both Plaintiff's and Defendant's briefs reference medical ruling SSR 00-3p, which was implemented by the Social Security Administration on May 15, 2000.  However, this guideline was superceded on September 12, 2002 by SSR 02-1p.  SSR 02-1p, 67 Fed. Reg. 57,859-57,864 (Sept. 12, 2002).  The two guidelines are identical for matters pertaining to this case, and for clarity the Court will refer to the guideline cited in the briefs.

or the climbing of ropes or ladders."  (Id.)  The ALJ did not discuss Plaintiff's obesity in determining her residual functional capacity at step four, but he specifically relied on Dr. Fechner's testimony and Dr. Merlin's and Dr. Tiersten's medical opinions, all of which found Plaintiff to suffer from obesity.  (Id.)  At step five, ALJ Friedman used a vocational expert to testify regarding the employment opportunities for someone with Plaintiff's residual functional capacity.  (R. at 21-22.)  The ALJ's hypothetical to the vocational expert did not specifically include the word "obesity" but did conform to the Plaintiff's residual functional capacity as determined at step four.  (Id.)

The framework for evaluating obesity in DBI and SSI claims is explicitly defined by the Social Security Regulations in SSR 00-3p, which requires consideration of the effects of obesity at all stages of the five-step evaluation process.  SSR 00-3p, 65 Fed. Reg. 31,039 (May 15, 2000).  Specifically, SSR 00-3p instructs that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately," and "obesity, by itself [may be] medically equivalent to a listed impairment."  (Id.)  Additionally, the ruling requires "consider[ation of] the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."  (Id.)  In analyzing the evidence, the ALJ is not obligated to employ particular "magic words,"  Sassone, 165 F. App'x at 959 (citing Jones v. Barnhart, 364 F.3d at 505) or adhere to a particular format in explaining his decision, Jones v. Barnhart, 364 F.3d at 505.

A review of the record demonstrates that the ALJ considered Plaintiff's obesity at step three of the analysis when he determined that her severe impairments did not meet or equal any of the listed impairments, either alone or in combination.  ALJ Friedman did not specifically identify

or discuss Plaintiff's obesity in his step three analysis.  (R. at 18-19.)  However, the ALJ relied on

Dr. Fechner's testimony that Plaintiff did not meet or equal any of the listed impairments, which

was substantively based on a review of the entire record, most significantly the reports of Doctors

Khan, Merlin, Micale, Noor, Patel and Tiersten.  (R. at 44.)  All of these doctors' analyses and

conclusions considered Plaintiff's obesity.  (R. at 247 (Dr. Khan's diagnosis of "[m]orbid

obesity"); R. at 265 (Dr. Merlin's diagnosis of "[o]besity"); R. at 280 (Dr. Micale's determination

that "[Plaintiff's] symptoms are attributable to the medically determinable impairment of morbid

obesity . . ."); R. at 293 (Dr. Noor's diagnosis of "[m]orbid obesity"); R. at 318 (Dr. Patel noting

that Plaintiff suffers from "[m]orbid obesity"); R. at 386 (Dr. Tiersten's diagnosis of "[s]evere

obesity").)  Therefore, despite the ALJ not using the "magic word" obesity, his analysis relied on

testimony, which was based on the medical records that acknowledged and considered Plaintiff's

obesity.  See Sassone, 165 F. App'x at 959.  Thus, though the ALJ did not "adhere to any

particular format" in addressing Plaintiff's obesity, he still necessarily considered it as a severe

impairment at step three.  See Jones v. Barnhart, 364 F.3d at 505.

    At step four, in finding that Plaintiff had the residual functional capacity to "perform

routine, sedentary work . . . that never requires crawling or the climbing of ropes or ladders," ALJ

Friedman considered Plaintiff's obesity.  (R. at 19.)  ALJ Friedman considered the entire record,

including the severity of the symptoms that he believed Plaintiff to have based on the objective

medical findings.  (Id.)  Each of the doctors that evaluated Plaintiff's functional limitations

considered her obesity.  (R. at 292 (Dr. Noor found that Plaintiff's "habitus" played a part in her

limitations); R. at 277 (Dr. Micale reported that Plaintiff's obesity would limit her to "perform

light work" and never climb ladders, ropes, or scaffolds); R. at 45 (Dr. Fechner testified that

Plaintiff should be limited to sedentary work based on his review of her medical records).)  Since

27

these doctors considered Plaintiff's obesity in determining that she should be limited to light or sedentary work and never climb ladders, ropes, or scaffolds, then the ALJ necessarily considered Plaintiff's obesity in determining her residual functional capacity, although he did not use the word "obesity." See Sassone, 165 F. App'x at 959; Jones v. Barnhart, 364 F.3d at 505.

At step five, ALJ Friedman considered Plaintiff's obesity by posing a hypothetical question to the vocational expert that sought his opinion of the employment possibilities for someone who was limited to sedentary, simple routine tasks, and could never crawl or climb ropes, ladders, or scaffolds. (R. at 52.) First, the ALJ based the hypothetical in part on Plaintiff's residual functional capacity, for which his analysis considered obesity. (R. at 21-22, 52; 20 C.F.R. §§ 404.1512(g), 404.1520(a)(4)(v), 404.1560(c)(1).) The hypothetical was also consistent with Dr. Micale's medical findings and Dr. Fechner's testimony regarding Plaintiff's functional limitations. (R. at 277 (Dr. Micale's medical findings); R. at 45 (Dr. Fechner's testimony); R. 52 (the ALJ's hypothetical).) Both of these doctors considered Plaintiff's obesity in determining her functional limitations. (R. at 277 (Dr. Micale reported that Plaintiff's obesity would limit her to "perform light work" and never climb ladders, ropes, or scaffolds); R. at 45 (Dr. Fechner testified that Plaintiff should be limited to sedentary work based on his review of Plaintiff's medical records).) Thus, the ALJ necessarily considered obesity by formulating his hypothetical around Plaintiff's residual functional capacity and the medical opinions of Dr. Fechner and Dr. Micale, despite not using the "magic word" obesity. See Sassone, 165 F. App'x at 959; Jones v. Barnhart, 364 F.3d at 505.

In short, although the term "obesity" was not used in the ALJ's analysis at steps three, four, and five, the underlying information upon which the ALJ's conclusions are based provides substantial evidence that the ALJ considered Plaintiff's obesity at each step. See Stunkard, 841

28

F.2d at 59.

### 2.     Did the ALJ Err by Assigning Controlling Weight to the Commissioner's Consultants in Lieu of Reliance on Dr. Noor's Medical Findings?

Plaintiff argues that ALJ Friedman erred by giving controlling weight to the medical opinions of Doctors Merlin, Potashnik, and Tiersten instead of relying on Dr. Noor's opinion. (Pl.'s Br. 26.)  Plaintiff asserts that the ALJ improperly rejected Dr. Noor's opinion that Plaintiff had "marked crepitus in both knees and ankles," which was endorsed by the medical expert Dr. Fechner in his identification of "fairly severe arthritis."  (Id.)  Specifically, Plaintiff argues the ALJ improperly disregarded these opinions without stating a reason for doing so.  (Pl.'s Br. 25-26.)  The Commissioner argues that:  1) Dr. Noor is not Plaintiff's treating physician; 2) Dr. Fechner's testimony supports the conclusions of Doctors Merlin, Potashnik, and Tiersten; and 3) the ALJ properly considered all of the medical evidence before relying on the medical opinions of Doctors Merlin, Potashnik, Tiersten, and Fechner.  (Def.'s Br. 10-11.)

This dispute focuses on step four of the analysis, in which ALJ Friedman found that Plaintiff had medical impairments that would cause pain in her legs, back, and spine but found that the "intensity, duration and limiting effects of these symptoms [were] not entirely credible." (R. at 19.)  In making this determination, the ALJ rejected Dr. Noor's opinion that Plaintiff had crepitus and a restricted range of motion in her knees and a restricted range of motion in her hips. (Id.)  Instead, ALJ Friedman relied on the medical opinions of Doctors Merlin, Potashnick, Tiersten, and Fechner that Plaintiff could move around normally except for squatting, she had a full range of motion in her lumbosacral spine, her straight leg raising was negative, and she did not have crepitus in her knees.  (R. at 20.)

In reviewing medical records,  "[t]reating physicians's reports should be accorded great

weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Plummer, 186 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)). The ALJ may reject a treating physician's opinion on the basis of contradictory evidence. Id. Moreover, the ALJ is free to choose the medical opinion of one doctor over that of another. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). However, the ALJ must provide "some indication of the evidence which was rejected." (Id.)

First, the Court notes that Dr. Noor is not Plaintiff's treating physician. Dr. Noor only saw Plaintiff one time, on October 10, 2003, for a disabilities assessment with the Division of Disability Determination Services. (R. at 290-93.) This is the same frequency that Plaintiff saw Doctors Merlin and Potashnick, also with the Division of Disability Determination Services. (R. at 263-66, 373-79.) Further, even if Dr. Noor was the treating physician, the ALJ may discount a doctor's medical opinion on the basis of conflicting medical evidence. See Plummer, 186 F.3d at 429.

Dr. Patel is Plaintiff's treating physician and is properly identified as such by the ALJ. (R. at 19.) Plaintiff identifies Dr. Patel as her treating physician on her Disabilities Report application dated June 6, 2002 (R. at 135), and Dr. Patel saw Plaintiff on approximately forty-eight occasions between April 16, 1999, and December 2, 2004 (R. at 294-372, 416-35). During this time, Dr. Patel treated Plaintiff for a number of ailments, including asthma, hypertension, and the pain in her back and knees. (R. at 419, 423-24.) However, Dr. Patel never diagnosed Plaintiff with crepitus in her knees and, since he is the treating physician, the ALJ may give significant weight to the absence of such a diagnosis. (R. at 294-372, 416-35; see Plummer, 186 F.3d at 429.)

Second, Plaintiff misinterprets the testimony of Dr. Fechner in stating that he supports Dr.

30

Noor's medical findings.  Dr. Fechner's testimony called into question the validity of Dr. Noor's

findings.  (R. at. 44-46.)  Dr. Fechner first clarified Dr. Noor's findings and then cast doubt upon

those findings by stating that Dr. Noor's conclusions were not supported by objective medical

evidence.  (R. at. 46.)  Specifically, Dr. Fechner testified that Dr. Noor diagnosed severe arthritis

of the knees without an x-ray (R. at 44) and explained that "one really would need to have an x-

ray to have a better idea," since "crepitus is a very subjective symptom sign as far as the doctor is

concerned" (R. at 46).  The fact that Dr. Noor's findings contradict those of Doctors Fechner,

Merlin, Potashnick, and Tiersten does not undermine the Commissioner's decision, since his

decision was still based on substantial evidence.  Sassone, 165 F. App'x at 955.

ALJ Friedman relied on the opinions of Doctors Merlin, Potashnick, Tiersten, and

Fechner, none of whom observed crepitus, a limited range of motion, or arthritic changes in

Plaintiff's knees.  (R. at 20.)  The ALJ acknowledged and compared the conflicting medical

evidence and exercised his discretion in choosing one set of medical opinions over the other.  See

Cotter, 642 F.2d at 705; Williams v. Sullivan, 970 F.2d at 1187.  Thus, the ALJ's rejection of Dr.

Noor's medical opinion in favor of Doctors Merlin, Potashnick, Tiersten, and Fechner was

supported by substantial evidence.  See Stunkard, 841 F.2d at 59.

### 3.  Did the ALJ's Hypothetical Posed to the Vocational Expert Properly Consider All of Plaintiff's Limitations?

Plaintiff argues that ALJ Friedman made several errors in his questioning of the vocational

expert at step five.  (Pl.'s Br. 26.)  First, Plaintiff asserts that the hypothetical posed to the

vocational expert was deficient since it did not mention her obesity.  (Id.)  As was discussed in

Part I of the Court's analysis, the ALJ adequately considered Plaintiff's obesity in his hypothetical

question.  Plaintiff also argues that the ALJ improperly disregarded the vocational expert's

testimony that a person would not be able to perform even the simplest jobs if he or she suffered from any of the moderate restrictions that were checked off in Section I of Plaintiff's MRFC form. (Pl.'s Br. 27-29.)  Finally, Plaintiff argues that the ALJ improperly disregarded the vocational expert's opinion that no jobs existed in the national economy if Plaintiff could not maintain attention and concentration due to pain or depression.  (Pl.'s Br. 30-35.)  Defendant asserts that the ALJ's step five determination was proper.  (Def.'s Br. 11.)

ALJ Friedman's hypothetical question to the vocational expert closely mirrored the state medical consultant's findings at Section III of the MRFC form.  (R. at 21-22.)  In Section III, the consultant opined that Plaintiff could maintain attention and concentration on simple tasks, despite the moderate and marked limitations determined in Section I.  (R. at 389.)  Additionally, the ALJ found the severity of Plaintiff's pain and depression to be "not entirely credible," based on the medical evidence in the record, specifically the consultant's Section III functional assessment.  (R. at 19-21.)  This functional assessment resulted in the vocational expert's testimony that over 40,000 jobs existed in the national economy that Plaintiff could perform, (R. at 52-53) which was considered by the ALJ (R. at 22).  Further, ALJ Friedman disregarded the vocational expert's response to cross-examination by Plaintiff's attorney that Plaintiff would not be able to perform any job if she suffered from the moderate limitations that the consultant found in Section I, or if pain or depression resulted in a difficulty to maintain attention and concentration on simple tasks.  (R. at 21-22.)

When evaluating Plaintiff's disability claim at step five, "[t]he ALJ must analyze the cumulative effect of all the [plaintiff's] impairments in determining whether she is capable of performing work and is not disabled."  Plummer, 186 F.3d at 428.  The ALJ must give consideration to Plaintiff's subjective complaints of pain when assessing the cumulative effects of

her impairments.  10 C.F.R. § 404.1529, 416.929; Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir.

1986).  Although "assertions of pain must be given serious consideration," Smith v. Califano, 637,

F.2d 968, 972 (3d Cir. 1981) Plaintiff still "bears the burden of demonstrating that her subjective

complaints were sustained by medical evidence."  Alexander v. Shalala, 927 F. Supp 785, 795

(D.N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996).  Accordingly, subjective claims of pain and

impairment "will not establish . . . [disability]; there must be medical signs and laboratory

findings . . . [demonstrating] medical impairments, which could reasonably be expected to

produce the pain or other symptoms alleged."  20 C.F.R. § 404.1529(a).  "Even situations where a

subjective complaint of pain coincides with a known impairment, it is within the discretion of an

ALJ to discount that claim if there is a rational basis to do so."  Alexander, 927 F. Supp at 795.

To help determine how Plaintiff's impairments effect the availability of jobs, "[t]he ALJ will

often seek the assistance of a vocational expert at [the] fifth step [of the analysis]."  Plummer, 186

F.3d at 428.  The ALJ will pose a hypothetical to the vocational expert for an assessment of the

availability of jobs in the national economy based on Plaintiff's age, education, past work

experience, and residual functional capacity.  See id. at 431.  However, the ALJ has the authority

to disregard the response of a vocational expert if the hypothetical is inconsistent with the medical

evidence in the record.  See id. at 428; Jones v. Barnhart, 364 F.3d at 506.

       In formulating the hypothetical posed to the vocational expert, ALJ Friedman relied on the

consultant's functional assessment of Plaintiff in Section III of the MRFC form.  (R. at 22.)  The

ALJ first pointed out that the MRFC's directions explicitly state that Section III is the "Functional

Capacity Assessment," as opposed to Section I, which is the "Summary Conclusions" section.

(Id.)  ALJ Friedman then noted that the word "moderate" as used in Section I may mean one thing

to the consultant and another to the vocational expert.  (Id.)  This is why the ALJ relied on Section

III of the form, which asks for a narrative explanation and clarification of any limitations found in Section I.  (See R. at 389.)  In Section III, the consultant's functional assessment was that Plaintiff could "follow simple instructions, attend and concentrate, keep adequate pace and persist, relate and adapt to routine tasks and work situations," despite the moderate and marked limitations that were checked off in Section I.  (R. at 22.)  This functional assessment was then incorporated into Plaintiff's residual functional capacity, which was the basis of the ALJ's hypothetical to the vocational expert.  (Id.)  It is the consultant's job to determine Plaintiff's functional limitations and the vocational expert's duty to determine the job opportunities based on, among other things, Plaintiff's functional capacity assessment.  (See R. at 389 (Functional Capacity Assessment instructions); 20 C.F.R. § 404.1569.)  Thus, because the ALJ relied on the consultant's final conclusion, namely the functional capacity assessment, the hypothetical to the vocational expert was supported by substantial evidence.  See Stunkard, 841 F.2d at 59.

Finally, the ALJ accounted for Plaintiff's complaints of pain and depression, based on the extent to which he found them credible upon consideration of the medical evidence in the record.  (R. at 21-22.)  First, Dr. Fechner testified, based on his review of the entire record, that Plaintiff could sit for at least forty-five minutes before pain would force her to stand, not a half hour as Plaintiff claimed.  (R. at 47.)  This correlates with the vocational expert's testimony that a person with Plaintiff's residual functional capacity could still perform the jobs he cited even if pain limited the plaintiff to sitting for only forty-five minutes every hour.  (R. at 54.)  Also, the consultant's functional assessment indicates that Plaintiff's psychiatric condition did not impair her ability to "follow simple instructions, attend and concentrate, keep adequate pace and persist, relate and adapt to routine tasks and work situations."  (R. at 389.)  Thus, the ALJ had a rational basis, supported by the opinions of a doctor and a psychologist, to discount Plaintiff's claims of

pain and depression.  See Alexander, 927 F. Supp at 795.  Since the ALJ discounted Plaintiff's claims of pain and depression based on medical evidence, it was within his discretion to disregard the vocational expert's testimony that a person could not work if pain or depression impaired their ability to maintain attention and concentration.  See Plummer, 186 F.3d at 428; Jones v. Barnhart, 364 F.3d at 506.  Thus, substantial evidence supported the ALJ's hypothetical to the vocational expert and subsequently his step-five determination was proper.  See Stunkard, 841 F.2d at 59.

## **CONCLUSION**

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and is affirmed.  An appropriate form of order will accompany this opinion.


Dated: August 4, 2008


     s/Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.

35